William E. MOTEN, Sr., et al.

v.

BRICKLAYERS, MASONS AND PLAS-
TERERS INTERNATIONAL UNION
OF AMERICA, et al. (two cases).

Appeal of ANTHONY IZZO
COMPANY, INC.

Appeal of MASON CONTRACTORS
ASSOCIATION OF THE DISTRICT
OF COLUMBIA.

Nos. 74–1835, 74–1837.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 28, 1975.

Decided May 6, 1976.

On Motion to Tax Attorneys Fees
Aug. 27, 1976.

John M. Bray, Washington, D. C., with whom Allen G. Siegel and Stanley J. Brown, Washington, D. C., were on the pleadings for appellant.

Gary D. Wilson, Washington, D. C., with whom Max O. Truitt, Jr., and Charles E. Hill, Washington, D. C., were on the pleadings for appellee Moten.

Laurence Gold, Washington, D. C., with whom J. Albert Woll and George Kauf-

mann, Washington, D. C., were on the pleadings for appellee Bricklayers International.

Before TAMM,* LEVENTHAL and ROBINSON, Circuit Judges.

PER CURIAM:

These complex and tangled consolidated appeals arise from the approval by the District Court of a settlement in a class action under Title VII of the Civil Rights Act of 1964 [1] to redress racial discrimination in the bricklaying industry in the Washington area. Work for bricklayers was divided jurisdictionally between commercial and residential jobs, with the latter being substantially lower paying. Two distinct local unions reflected this jurisdictional split. Local 1, which had jurisdiction over commercial work, was predominantly white, whereas Local 4, which had jurisdiction over residential work, had a membership which was predominantly black. It was alleged that the skills required for each work category were so sufficiently similar that the existence of two distinct locals was merely a vehicle for racial segregation and wages which differed essentially by race.

On May 10, 1971, Moten and others filed discrimination charges with the Equal Employment Opportunity Commission (EEOC), and after unsuccessful attempts at conciliation, suit was brought in the District Court.[2] That suit was a class action maintained on behalf of all members of Local 4 against Local 1 and the Bricklayers International Union [International]. Two years were consumed in discovery and plaintiffs' unsuccessful summary judgment motion. Just before a pretrial conference, the parties reached agreement in principle, and in due course a stipulation of settlement [3] was agreed upon. District Judge Aubrey E. Robinson preliminarily approved the agreement, and scheduled hearing for June 26, 1974, under Rule 23(e) of the Federal Rules of Civil Procedure.[4] The twenty-three page settlement document created an $80,000 back pay fund, designed to recompense those who suffered discrimination, based upon factors of race, years of membership and hours worked. The jurisdictional barrier was to be overcome by merger of the two locals into new Local 6, which was mandated to carry out a strong affirmative action program, setting forth employer-by-employer goals.[5]

While construction industry employers had earlier not sought to participate in the intra-union squabbles, they argued vigorously at the settlement hearing that they should be party to any agreement, sensing that the substantial change about to be worked in the bricklaying industry was adverse to their interests. In fact, another (but overlapping) class of plaintiffs had brought suit against the chief employer, alleging racial discrimination, and seeking relief wholly apart from the reorganization

---

* Circuit Judge Tamm took no part in the consideration or decision of this case.

1. 42 U.S.C. § 2000e et seq. The Amended Complaint also alleges violation of 42 U.S.C. § 1981.

2. *William E. Moten, Sr., et al. v. Bricklayers, Masons and Plasterers International Union of America, et al.* (D.D.C. Civil Action No. 2329–71, filed November 19, 1971) [hereinafter *Moten v. Bricklayers*].

3. Original record of the United States District Court for the District of Columbia, *Moten v. Bricklayers, supra*, Volume VI, document number 84 [hereinafter Original Record]. Also appears as an attachment to plaintiff-appellees' Motion to Dismiss or in the Alternative for Summary Judgment filed in this court.

4. Order of the Court, *Moten v. Bricklayers, supra* (D.D.C. May 30, 1974, unreported), appears in the Original Record, Volume VI, document number 85. Also appears attached to plaintiff-appellees' Motion to Dismiss or in the Alternative for Summary Judgment filed in this court.

Rule 23(e) of the Federal Rules of Civil Procedure provides in full:

(e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

5. See note 16 *infra*, text thereat, and text at pp. ———— of 177 U.S.App.D.C., 232–233 of 543 F.2d.

of the unions. *Charles H. Kimber, et al. v. Anthony Izzo Company, Inc.* (D.D.C. No. 1337–73, filed July 3, 1973). Following the request of Anthony Izzo Company, Inc. [Izzo] to intervene in the intra-union suit as a party defendant, and to consolidate this case with *Kimber, supra,* the District Judge did allow Izzo to state its objections to the settlement. Izzo contended that alleged racial discrimination in the unions and by employers (which it said was at union insistence) ought not be treated piecemeal, and that therefore the settlement should not be permitted to go into effect, lacking, as it did, any employer input.

On June 28, 1974, the District Judge entered a final judgment approving the stipulation of settlement and dismissing the action with prejudice.[6] Izzo's motions to intervene and to consolidate were denied. The District Court retained jurisdiction to supervise the carrying out of its decision, and the new merged union, Local 6, has since come into being. The International has authorized distribution of the first $30,000 from the back pay fund, but these appeals have prevented completion of the back pay program. Moten further argues that during the pendency of this appeal, Local 6's affirmative action program is being undermined.

No. 74–1835 is the appeal taken by Izzo from the final judgment, challenging the denial of its motions to intervene and to consolidate, as well as attacking the approval of the settlement. The question presented can thus be stated: was Izzo entitled to intervention as of right under Rule 24(a), Federal Rules of Civil Procedure?

No. 74–1837 is the appeal taken by the Mason Contractors Association of the District of Columbia [Masons]. While appearing at the hearing, this appellant *never even sought to be made a party* to the proceedings in the District Court. Masons likewise protest the failure to include employer views in the settlement.

## I. MOTION TO DISMISS APPEAL IN NO. 74–1837

We reach first the motion by appellee Moten to dismiss the Masons' appeal in No. 74–1837. While Masons did file papers at the request of the District Court, and were represented by counsel during the Rule 23 hearing, there is no indication in the record that they ever sought intervention as a party, and in fact they stand in a relationship analogous to that of an amicus curiae. This court announced a clear and simple rule in *United States v. Seigel,* 83 U.S.App.D.C. 88, 168 F.2d 143, 144 (1948): "It has long been settled that one who is not a party to a record and judgment is not entitled to appeal therefrom." This rule has a long history of acceptance, *Heilman v. Ginberg,* 109 U.S.App.D.C. 105, 106, 284 F.2d 239, 240 (1960); *United States v. McFaddin Express, Inc.,* 310 F.2d 799, 801 (2d Cir. 1962); *First Iowa Hydro Electric Coop. v. Iowa-Illinois Gas & Electric Co.,* 245 F.2d 630, 631 (8th Cir. 1957), and cases in this Circuit permitting post-judgment intervention[7] should not be controlling where clear opportunity for pre-judgment intervention (a procedure not formally sought herein) was not taken. As amicus curiae may not appeal from a final judgment, the appeal of Masons must be dismissed for want of jurisdiction.

## II. MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY AFFIRMANCE IN NO. 74–1835

This appeal was taken by the Anthony Izzo Company from the District Court's final judgment. Izzo sought and was denied intervention, both permissive and as of right. Denial of intervention as

---

6. Final Judgment Approving Stipulation of Settlement and Dismissing Action With Prejudice, *Moten v. Bricklayers, supra* (D.D.C. June 28, 1974, unreported) [Final Judgment], appears in the Original Record, Volume VI, document number 100. Also attached to plaintiff-appellees' Motion to Dismiss or in the Alternative for Summary Judgment filed in this court.

7. *Wolpe v. Poretsky,* 79 U.S.App.D.C. 141, 142–144, 144 F.2d 505, 506–508, *cert. denied,* 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944); *Smuck v. Hobson,* 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

of right is an appealable final order,[8] and we review that denial in the instant proceeding.

## A. Timeliness of Intervention Sought

[5, 6] Intervention, whether of right or permissive, must be timely. If untimely, it must be denied. *NAACP v. New York*, 413 U.S. 345, 365–66, 93 S.Ct. 2591, 2602–2603, 37 L.Ed.2d 648, 662–663 (1973). Here Izzo moved in mid-1974 to intervene in a complex suit commenced in 1971 which had proceeded through difficulties to a stipulation of settlement preliminarily approved. However, time elapsed since the inception of the suit is but one factor to be considered. As in *Hodgson v. United Mine Workers*, 153 U.S.App.D.C. 407, 418, 473 F.2d 118, 129 (1972), we said,

> the court should also look to the related circumstances, including the purpose for which intervention is sought, the necessity for intervention as a means of preserving the applicant's rights, and the improbability of prejudice to those already parties in the case. (footnotes omitted)

Here it appears that Izzo's decision not to seek intervention much earlier may have been an informed, tactical one in light of the parallel litigation. Not only had the *Moten* suit received substantial industry and public attention, but the *Kimber* suit against Izzo was ten months underway before intervention and consolidation were sought in *Moten*, and Izzo had not sought to implead the unions in *Kimber* either.[9] Izzo claims that the *Kimber* plaintiffs failed to give the District Court (and Izzo) notice that their suit was related to the on-going

*Moten* suit. Under the facts of this case, Izzo's delay in intervening is not to be excused on the technical ground of failure of the *Kimber* plaintiffs to give such formal notice since Izzo did not claim—and in all likelihood could not claim—that it did not have actual notice. Moreover, it is not shown that any untimeliness must be overlooked to protect Izzo's rights. Izzo can be viewed as exposed to direct liability in the *Kimber* suit only, and should it lose there, the order sought by the plaintiffs therein (rather than the terms of settlement in *Moten*) will likely govern Izzo's future dealings with Local 6.

The third branch of the *Hodgson* test is most significant as to Izzo. Any measure of timeliness of the motion to intervene must be cast against the backdrop of two years of controversy between the unions which now have reached settlement. The District Court would have been well within the bounds of appropriate judicial discretion had it chosen to deny intervention to avoid risk of the hard-won settlement package becoming undone.

While it thus appears likely from the record that Izzo's motion to intervene was untimely, the final judgment entered by the District Court does not recite the reasons for its denial.[10] and we proceed to rest our decision additionally upon the absence of a legally sufficient intervention interest.

## B. Intervention Interest: Direct

Rule 24(a)(2) of the Federal Rules of Civil Procedure requires three factors to coincide in order for intervention as of right to lie. Intervention shall be permitted:

---

8. Moore's Federal Practice ¶ 24.15 n.4: "a jurisdictional rule has arisen under which an order denying intervention is appealable if intervention was a matter of right." *See Sam Fox Publishing Company v. United States*, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). Izzo had also sought, and been denied, consolidation of the *Kimber* and *Moten* suits. However, there is precedent in other Circuits holding that such denial is not an appealable final order. *NAACP v. Michot*, 480 F.2d 547 (5th Cir. 1973); *Garber v. Randell*, 477 F.2d 711 (2d Cir. 1973); *United States v. Chelsea Towers, Inc.*, 404 F.2d 329 (3rd Cir. 1968). Here we hold that Izzo did not have sufficient interest to warrant interven-

tion as of right, and we decline to reach the question of consolidation, which is ordinarily left to the sound discretion of the District Court.

9. *See* text at pp. ———— of 177 U.S.App.D.C., 236–237 of 543 F.2d.

10. Final Judgment at 2. Ordering paragraph (1) says in full: "The aforesaid motions of Anthony Izzo Company, Inc. to intervene and to consolidate, as well as the pending Emergency Motion to Reschedule Hearing, are hereby denied."

when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

At issue is whether employer Izzo's concerns about various terms in the stipulation of settlement were sufficient to constitute an interest requiring intervention before the District Court under Rule 24(a)(2). In large part, our inquiry turns on whether there is room under the court-approved settlement for the newly-formed union, Local 6, to recede from the strict terms of the agreement so that it may enter freely into collective bargaining with Izzo and other employers. Both sides agreed with the District Court that Izzo was not itself in any way legally bound by the agreement to which it was not a signatory.[11]

■ The first contention of Izzo's attorneys and those of Masons was an interest in the selection of the EEO officer for Local 6 under paragraph 14(b),[12] but the District

---

**11.** Counsel for the *Moten* plaintiffs said of the stipulation of settlement: ". . . it is quite clear that our agreement does not impose obligations, contractual obligations on the employers. It sets down, as [Your Honor] stated yourself from the bench, the union's internal concept of what employer goals should be." Tr. at 46. Further on, counsel re-emphasized: "This settlement, this merger agreement, the terms therein do not contractually obligate Izzo or any other contractor in any way, and that, of course, is the, if you will, the gut reason why no intervention could be really considered, Your Honor." Tr. at 47. Similarly, counsel for Masons conceded: "You have a situation where nothing you do here today would bind the employer." *Id.*

An earlier colloquy with plaintiffs' counsel illustrates the limited impact which the District Court believed the agreement would have on the employers:

The Court: If this settlement is approved in its present form, there is going to be more difficulty for Izzo and counsel at the bargaining table; is there not?

Mr. Mayers: I hope there will not be more difficulty here.

The Court: But, I mean, they will have a united front in an area that they didn't have it before, it seems to me. Nobody has told me to the contrary.

Mr. Mayers: The Unions will be stronger at the bargaining table and they will have goals which they hope to see maintained by the employers.

The Court: Yes. Now, explain to me how I can impose any conditions in this settlement in abrogation of the unions' and the employers' right to negotiate their contract. That suggestion is inherent, it seems to me, in the argument that I have heard.

Mr. Mayers: But not for me.

The Court: No.

Mr. Mayers: I can't give you any suggestions.

The Court: And I cannot understand that. I am not telling either the union or Izzo or any other member of the Council how they are going to bargain. That's not involved in this settlement . . .

Tr. at 44–45. Clearly the District Court interprets the settlement as obligating the union to seek certain goals, but does not see the adoption of those goals by the union as controlling the outcome of collective bargaining. Rather, the settlement is premised upon satisfying plaintiffs that Local 6 will pursue its affirmative action policy with vigor. But this agreement does not take the place of collective bargaining by unions and employers, nor does it tell either side "how they are going to bargain."

**12.** Paragraph 14(b) provides:

(b) *EEO Officer.* Local 6 shall have an Equal Employment Opportunity Officer ("EEO Officer") during the period July 1, 1974, until August of 1979. For the period July 1, 1974, until August of 1976, the position of EEO Officer shall be a separate full-time position to be held by Robert R. Smith, Jr., who will be paid compensation equal to the commercial scale for 40 hours work. Commencing in August of 1976 the Business Representative elected in accordance with paragraph 7(b)(ii) above shall serve as Local 6's EEO Officer.

The functions of the EEO Officer shall be as follows:

(i) to ensure that Local 6 is following nondiscriminatory practices with regard to referrals, apprenticeship training, and all other union functions;

(ii) to ensure that all employers with whom Local 6 has collective bargaining agreements are following nondiscriminatory employment practices;

(iii) to supervise the keeping of the records required to be kept by paragraphs 11(d) and 14(a) above;

(iv) to process claims of racial discrimination made by members of Local 6 and exer-

Court informed them that the position to be filled in accordance with the settlement was an "in-house" union post. Respecting the desirability of a unified EEO officer for the entire industry, the court suggested that the parties could negotiate such an arrangement, if proposed by either side, and that the stipulation neither mandated nor prevented it.[13] The District Court determined that Izzo hadn't "gotten over the first hurdle" in presenting a legal interest cognizable by the court.[14] Nonetheless, by suggesting that the union might, at collective bargaining, negotiate selection of an industry-wide EEO officer to supersede the "in-house" union officer, the court demonstrated that it interprets the settlement not to be without flexibility.

■ Employer Izzo's second contention is that since it is compelled (by circumstances, not by law) to hire at least some union bricklayers, it will be caught between two conflicting policies established for Local 6 in the stipulation of settlement. Under paragraph 11(a)[15] a unified, color-blind list of available bricklayers will be maintained and an employer contacting the union for referrals will be compelled to hire in the order names appear on the list, irrespective of race. Under paragraph 14(c),[16] however,

cise authority (which authority shall be exclusive) to determine after consultation with legal counsel the action to be taken with respect to such grievance;

(v) to endeavor to obtain, on the basis of information secured through the quarterly records, employee complaints, and his own investigations, acceptance by employers with whom Local 6 has collective bargaining agreements of affirmative action programs to increase the employment opportunities of black bricklayers at both the bricklayer and foreman level;

(vi) to utilize the offices and resources of the Equal Employment Opportunities Commission, other appropriate agencies, and the courts to ensure *equal opportunities for black bricklayers within Local 6's jurisdiction;*

(vii) to investigate the employment practices of employers with whom Local 6 does not have collective bargaining agreements to determine whether such employers are discriminating against black bricklayers and, if they are, to take such steps as he determines appropriate to overcome such discrimination; and

(viii) to assist Local 6's Business Representatives and the persons assigned by the International in accordance with paragraph 12 above in organizing unorganized bricklayers within Local 6's jurisdiction.

Compare the EEO Officer's exclusive authority to handle claims of racial discrimination made by members of Local 6 after consultation with legal counsel, with his authority to bring suit under paragraph 14(c)'s employer affirmative actions goals, pp. ———— of 177 U.S.App. D.C. 232–234 of 543 F.2d.

13. Transcript of Proceedings of the Settlement Hearing before the United States District Court for the District of Columbia, June 26, 1974 [Tr.], at 23–24.

14. Tr. at 25.

15. Paragraph 11(a) provides:

11. Job referrals. Local 6 shall operate the following job referral program, and no officer of Local 6 shall refer any bricklayer to any job opportunity other than in accordance therewith:

(a) Local 6 shall maintain a sign-in list for out-of-work bricklayers who wish to be referred to work in response to any employer request. A new list shall be utilized every two weeks and each bricklayer who wishes to be referred to work must sign the new list, whether or not he signed a prior list. Bricklayers signing the list shall leave a telephone number at which they can be reached.

Subparagraph (b) provides for methods of notification offering work to those listed, posting of results of those notifications, relisting of those so notified who decline, and delisting of those so notified who accept. Subparagraph (c) is a protective clause: "Nothing in this job referral procedure shall be interpreted to require an employer to hire any individual referred unless that employer has agreed to do so." Subparagraph (d) provides for a three-year retention of referral program records.

16. Paragraph 14(c) provides in pertinent part:

(c) *Employer Affirmative Action Goals.* Local 6 shall establish yearly affirmative action goals for employers with whom it has collective bargaining agreements. The yearly goal for each employer shall be the higher of (i) the percentage which black members of Local 6 (or Local 1 and Local 4) who worked 50 hours or more as bricklayers as shown by the records compiled under paragraph 14(a) above in either the first or second quarter of the year were of the total members of Local 6 (or Local 1 and Local 4) who worked 50 hours or more as bricklayers during that period as shown by those records; (ii) the percentage which black bricklayers employed by the employer whose goal is being established in the first or second quarter of the year were

Local 6 is required to set "employer affirmative action goals," and employers who fail to meet their union-set goals may anticipate adverse legal action by the local's EEO officer.[17] Izzo argues that in trying to meet union percentages of black bricklayers in its workforce, it will arguably have to turn away some persons referred to it from the union list solely because they are white.[18] This, it is suggested, could not only result in Title VII suits by those not hired, but could also compel the employer to pay half-day "show-up pay" to all who so appear.

A keystone of the Izzo argument is that even if the employer acts in the best of faith to steer a midchannel course between conflicting policies, and although the appellees say that only such a good faith effort is required, nothing in the stipulation of settlement protects an employer against these unreasonable and contradictory demands. The following exchange in the District Court substantially illuminates this issue:

> of the total bricklayers employed in the first or second quarter of the year by such contractor. The employer affirmative action goals for the year 1974 shall be established as soon as practicable but in any event no later than September 1, 1974.
>
> For succeeding text, and an analysis of the role of the Washington Lawyers Committee for Civil Rights Under Law in the decision to bring suit under this paragraph, *see* pp. ——-—— of 177 U.S.App.D.C., 232–234 of 543 F.2d *infra.*

17. The uninterpreted language of that provision provides that where the records maintained with respect to any employer show failure to achieve affirmative action, the EEO officer shall act, "[u]nless advised to the contrary after consultation with legal counsel provided by or through the Washington Lawyers Committee for Civil Rights Under Law . . ." See notes 18 and 22 *infra.*

18. This is because under paragraph 14(c) certain percentage variances in racial composition of workforce from agreement-set goals, or failure to provide substantially equivalent pay or promotion opportunities to blacks, trigger litigation unless the Committee advises otherwise.

There has been contention between the parties concerning whether a goal is a fixed quota which must be attained immediately, or an aiming point to be reached approximately and over a period of time. We leave resolution of the definition and application of these employer

The Court: Well, do you know how long I maintain control over this action? I don't wipe my hands of this if I approve a settlement.

Mr. Brown: I realize that, Your Honor. All I am saying is that a good faith standard is not memorialized in the proposed settlement agreement.

The Court: Well, I will memorialize it.

Mr. Brown: That would be helpful.

The Court: Yes. Well, this whole thing is predicated upon good faith, and the reason I am having this hearing is that I want to smoke out any shenanigans, and that's exactly why it's an open hearing with all the notice being given that I could conceive.

Tr. at 29.

In memorializing such a good faith test of employer performance, District Judge Robinson substantially undermined any claim of intervention interest which Izzo might otherwise have had in the settlement. This affirmative action goals to the parties and the process here outlined, in the first instance. We think it possible that in the context of shared power, the Committee may advise that litigation not be brought where employers have acted in good faith to achieve substantial compliance with these goals.

The attorney for Masons argued in the District Court that by approving the stipulation of settlement, that court would give its sanction to inflexible application of goals at collective bargaining. Tr. 47–48. The central argument there advanced was that percentage goals cannot be achieved in a declining industry without laying off some workers (high seniority whites) in order to make a place for others (low seniority blacks). In oral argument before us, Izzo's counsel again contended that to affirm the judgment below is to give legal imprimatur to the chain of events which might well lead to the layoff of white bricklayers innocent of racial discrimination in order to meet goals for the hiring of black bricklayers. While adamant in our desire to leave primary interpretation of this settlement to the parties, the Committee and the District Court, we do not see that result as inherent in the language of the agreement. We do not pass upon the lawfulness of a settlement agreement which required such a result, or upon the question whether such an agreement would permit an employer to intervene to assert the rights of his senior white employees.

puts to rest any contrary approach to the meaning of the decree that might have been based on the language of the District Court's order of May 30, 1974, conditionally approving the settlement and scheduling the hearing. That order said:

8. If the Court, after the hearing referred to . . . shall finally approve the proposed Stipulation of Settlement, a final judgment of this Court will be entered in this action, which final judgment will:

 \* \* \* \* \* \*

(b) Require all parties to perform the acts called for by the proposed Stipulation of Settlement and to execute and deliver such other and further documents and papers as the Court deems

 \* \* \* \* \* \*

(e) Provide that the Court shall have and retain jurisdiction to ensure that the parties (including in the case of Local 1 and Local 4 their successor) shall perform the acts called for by the proposed Stipulation of Settlement.[19]

Both of these standards enunciated in the May 30, 1974, order were restated in the ordering language of the District Court's final judgment of June 28, 1974, which followed upon the District Court's memorialization of good faith, and we read them to be more flexible than their plain words might otherwise suggest. The judgment of June 28 reads:

(5) All parties (including in the case of Local 1 and Local 4 their successor) are required to perform the actions called for by the Stipulation of Settlement.

(6) This Court shall retain jurisdiction of the subject matter encompassed by the Stipulation of Settlement to ensure that the parties (including in the case of Local 1 and Local 4 their successor) shall perform the acts called for by such Stipulation and this Final Judgment.[20]

The retained jurisdiction of the District Court, when combined with Judge Robinson's express, on-the-record memorialization of a good faith standard, serves to defeat the argument that an employer facing Local 6 in collective bargaining has an intervention interest in the intra-union settlement creating that local because he might be whipsawed by contradictory elements in the agreement.

That, however, does not conclude the matter for it is not an entirely frivolous point that implementation of the agreement may put various of the bricklayers' employers in circumstances very different from those normally faced on collective bargaining. This is because of the unique role assigned by the agreement to the Washington Lawyers Committee for Civil Rights Under Law. We refer again to paragraph 14, *EEO Program.*

Paragraph 14 provides that Local 6 shall not engage in discrimination, shall take steps to ensure that employers with whom it has agreements do not engage in discrimination, and shall seek to overcome the effects of past racial discrimination by adopting the following EEO program. Paragraph 14(a) provides for racial composition and employment records, paragraph 14(b) provides for an EEO officer (commencing August, 1976, the union's elected business representative), who is authorized, *inter alia,* to process claims of racial discrimination and "exercise authority (which authority shall be exclusive) to determine after consultation with legal counsel the action to be taken with respect to such grievance." Paragraph 14(c), *Employer Affirmative Action Goals,* provides that Local 6 shall establish yearly affirmative action goals for employers with whom it has collective bargaining agreements. The goal is the higher of the percentage of blacks among (i) members of the union; or (ii) bricklayers employed by the employer (with specific provisions for calculating the percentages). Paragraph 14(c) continues:

Unless advised to the contrary after consultation with legal counsel provided

**19.** Order of the Court, *Moten v. Bricklayers, supra* (D.D.C. May 30, 1974, unreported), *supra* note 4.

**20.** Final Judgment, Original Record, Volume VI, document number 100, *supra* note 6.

by or through the Washington Lawyers Committee for Civil Rights Under Law pursuant to paragraph 21 below, Local 6's EEO Officer shall take all steps in his power to disqualify from participation in any government or government-funded construction by and to institute proceedings leading to a civil action for back pay and prospective injunctive relief against any employer for whom the records maintained in accordance with paragraph 14(a) above show: [failure to substantially meet the prescribed percentages constituting the employer's affirmative action goal, or failure to award substantially equivalent pay and promotion-to-foreman opportunities to blacks] [21]

In approving the settlement, the District Court has confirmed this unique role for the Washington Lawyers Committee, and made that body something akin to a court-approved monitor of adherence of Local 6 to the rights of its members.[22] Accordingly, the situation is not identical to a simple merger of Local 1 and Local 4 into Local 6. It is no answer to say that employers can protect themselves against union demands, through collective bargaining, when that will not protect them against EEO suits which even the union, acting in good faith, may not stop. Further, since the agreement's terms have been expressly incorporated into the order and judgment of the District Court, the union risks possible contempt proceedings if it concurs in an employer position that is later argued to deviate from the agreed-upon goals. We must give this provision special scrutiny.

It is not sufficient for a holding of no intervention interest in employers such as Izzo that freedom exists for the union to recede, in collective bargaining, from hardline insistence upon harsh or contradictory terms. We must find, as well, that the charter to the Washington Lawyers Committee is similarly conditioned upon good faith and reasonableness in application.

Point-by-point construction and application of the agreement must rest with the parties and with the District Court. Nonetheless, we may sketch our understanding of the broadest outlines. By memorializing a good faith standard the District Judge provided the unions with leeway to negotiate some phase-in of the hiring goals. But with the language of the decree making its enforcement obligatory on the parties—sub-

---

21. See note 3 *supra*.

22. If we are mistaken as to what the District Court intended, and if within its continuing jurisdiction that court were to give a more restrictive reading to the language here discussed, we would also approve such an interpretation. Thus, the District Court might hold that "legal counsel provided by or through the Washington Lawyers Committee for Civil Rights Under Law pursuant to paragraph 21 below," means simply an individual attorney selected by or from among the membership of the Committee. The Committee's role would start and stop with designation of a lawyer, and that lawyer would treat Local 6's EEO officer as he would any other client. Thus read, paragraph 14(c) would not be a strict "litigation—unless" provision, for the EEO officer would remain free to disregard his lawyer's advice. Arguing against such an interpretation is the language of paragraphs 21 (as referred to above) and 20. Paragraph 21 provides that fees and costs paid to plaintiffs' counsel shall be contributed:

to the Washington Lawyers Committee for Civil Rights Under Law, which has indicated its willingness to perform the functions set forth in paragraph 20 above, and to serve as counsel, or to assist in obtaining volunteer counsel, to Local 6's EEO Officer in order to ensure enforcement of the provisions of this Stipulation of Settlement.

The Committee's assigned functions under paragraph 20 involve settling of disputes with respect to participation and dollar value of such participation in the back pay fund created by the stipulation. Such decision shall be final:

(d) Any objection which any person may have relating to his entitlement to participate in the distribution of the back pay fund or to the number of shares of the back pay fund to be paid to him shall be made in writing and mailed to counsel for plaintiffs on or before September 21, 1974. Any such objection shall be resolved by the Director of the Washington Lawyers Committee for Civil Rights Under Law or his designee whose decision shall be final and conclusive. (pertinent part)

We believe this grant of authority to protect the rights of the plaintiff class members in recovery for past discrimination illuminates the

ject to safety-valves after consultation with the Washington Lawyers Committee—the District Court denied the unions carte blanche and made it impossible for the unions to avoid the agreement altogether. Similarly, we believe that while the Washington Lawyers Committee is established in the role of monitor, it does not have a charter of absolute prerogative to veto any and all collective bargaining between union and employers. The Committee is also subject to the premise of reasonableness and good faith. Counsel for appellees suggested during oral argument that the presence of the Washington Lawyers Committee will soften the impact of the agreement. As we see it, inclusion of the "litigation—unless" provision places the Committee in the role of watchdog, to safeguard the rights of the plaintiff class and the merged union, and to prevent unduly cozy relationships between union and employers. It is possible, perhaps likely, that the Committee will press for court-defined hiring standards while the union and management will prefer bargained settlements. The supervision of the District Court may be required so that a reasonable execution of the agreement in good faith emerges from shared power.

Upon our own construction of District Judge Robinson's judgment and order, upon our reading of his memorialization of good faith within the rubric of continuing jurisdiction, and upon the argument held before us, we are satisfied that the instant agreement can be given life without impairing or impeding the protection of any valid interests of employer Izzo (the only employer before us) and of other employers not party to this appeal.

█ While we deny the presence of an intervention interest at this time, we consider the possibility that Izzo and the other employers may find themselves at a point where the interpretation of the agreement

by the unions, the Committee, or the District Court provides them with the three requisites for intervention as of right under Rule 24. If such a situation develops, they may intervene at that time to invoke the court's continuing jurisdiction for their protection. Intervention may be allowed after a final decree where it is necessary to preserve some right which otherwise cannot be protected. *Wolpe v. Poretsky, supra* note 7; *Cuthill v. Ortman-Miller Machine Co.,* 216 F.2d 336 (7th Cir. 1954).

As to the employees, white and black, it must be remembered that such of them as are union members will have continued access to the District Court via their new union, Local 6. Thus, the union could seek assistance from the court if an overzealous Committee attempted or threatened suit which might upset delicate and reasonable collective bargaining. Conversely, the Committee could seek judicial intervention if the unions appeared on the verge of making unreasonable collective bargaining agreements which would place the employers in stark violation of the hiring goals, or other flagrant disregard of employee rights under the stipulation of settlement. We believe that such an arrangement is in the contemplation and spirit of the agreement.

The settlement was intended chiefly to put the union house in order, and has not thus far resulted in any acts which generate an intervention interest in employer Izzo. Maintaining as it does that any pattern of discrimination in the industry was the fault of the unions and not employers such as itself, Izzo fails to show its own legal interest in dictating the terms upon which the union will realign itself, recompense victimized members, or seek equal employment opportunity. While Izzo may prefer fragmented union locals, it certainly has no right to intervene solely to prevent unified union strength.[23] Once the settlement has

---

intent of paragraph 14(c), and confirms the correctness of our interpretation in text.

**23.** The transcript shows that the District Court distinguished between a tactical or economic interest in the composition of the employer's collective bargaining opposite, and a legally cognizable intervention interest:

The Court: . . . I have to know what legal interest you have to come into this litigation.

Mr. Brown: Our interest is that the way that this settlement agreement works will affect us as a bricklaying contractor.

been explained and circumscribed by this court and the District Court, there appears no reason why employer interests cannot adequately be protected in the context of collective bargaining.

### C. *Intervention Interest: Impact Upon Litigation*

 Izzo's counsel suggested that his third and most serious objection to the settlement involves the interface between the *Moten* and *Kimber* suits, and the language of paragraph 16 by which the settling parties pledge to take certain positions in other EEO litigation.[24] By that section, the defendant unions have pledged to resist their own impleader in *Kimber,* the Local 6 EEO officer is pledged to avoid imposition of liability upon the unions in other equal employment opportunity suits, and bound union members are pledged to reimburse the defendant unions for any sums recovered from the unions in other litigation. These provisions, and their potential for prejudicing employer interests in other litigation, again bear very close scrutiny.

Whether or not paragraph 16 gives rise to any intervention interest in employer Izzo depends largely upon who is bound thereby, and how inflexibly it must be enforced.

Specifically, the defendant unions pledge in paragraph 16(a) that:

Should an attempt be made to implead or otherwise draw the International, Local 1, Local 4 or Local 6 into any existing or future litigation based on allegations of discrimination against an employer, they shall vigorously defend [that they are not responsible for any discriminatory treat-

ment] so as to avoid a finding of liability as to them.

This provision is merely a formal restatement of the position held by the defendant unions throughout this lawsuit. Nor do the provisions of paragraph 16(a) limit the right of plaintiffs in *Kimber* or other suits to sue or assent to the impleader of any union as a party defendant to an equal employment opportunity action.

In paragraph 16(b), plaintiffs' counsel and the new EEO officer of Local 6 are similarly pledged to hold the unions harmless in new or pending related litigation:

(b) In recognition of the interest of all members of Local 6 in maintaining a strong union and in light of defendants' cooperation in settling this litigation, the EEO Officer shall take *all actions, within the scope of his responsibilities and in accordance with his obligations to the members of Local 6 affected,* to avoid the imposition of liability upon the International, Local 1, Local 4, or Local 6 as a result of any action brought pursuant to paragraph 14(c) above. Counsel for plaintiffs in this action shall also seek, *by all lawful means and in accordance with their obligations to the plaintiff class,* to establish that liability should not be imposed upon the International, Local 1, Local 4, or Local 6 as a consequence of *Kimber, et al. v. Anthony Izzo Company, Inc.,* Civil action No. 1337–73 in the United States District Court for the District of Columbia. (emphasis added)

On its face, this provision raises thornier questions than does paragraph 16(a), for it imposes complex and potentially contradictory duties upon Local 6's EEO officer and

---

The Court: It's going to give you a headache and it's going to give you a united front, especially in certain areas that you have never had before to face at the bargaining table. That's what is going to happen as a result of it. That's what you and the bricklayers are concerned with.

Tr. at 25. Here, the District Court uses the phrase "united front" to refer to the fact that both commercial and residential bricklayers will be represented by the same local. See in addition note 11 *supra.*

**24.** See note 3 *supra.* Izzo's Motion for Leave to File Supplemental Memorandum is addressed to this argument of prejudicial interrelationship between the two lawsuits. In our effort to discern whether any intervention interest appears in this matter, we have granted appellant Izzo's motion, and have examined the submitted documents which are dehors the record in this appeal. We find no intervention interest to be revealed therein, provided that our decision is not read to preclude consideration of Izzo's pending motions in the stayed *Kimber* litigation.

counsel for the *Moten* plaintiff class. The EEO officer of merged Local 6 may be called upon to engage in litigation under paragraph 14(c) where some union members' interests do not coincide with those of the *Moten* plaintiffs (who will have already benefitted from settlement of their grievances against the unions, participated in the back pay fund, and are bound by paragraph 16(c), *infra*, to reimburse the unions for any additional recovery from union funds in other lawsuits). Similar considerations apply to the role to which counsel for the *Moten* plaintiff class has been pledged. The overlapping plaintiff classes in both *Moten* and *Kimber* are represented by the same firm of lawyers. Since the interests of those bricklayers who are plaintiffs in both suits no longer coincide with those of bricklayers whom we may term pure-*Kimber* plaintiffs (whose remedy may not, after all, be limited to recovery from the allegedly discriminatory employer), the latter group might well benefit from the assistance of thoroughly independent counsel. Nevertheless, the present agreement does not give employer Izzo an intervention interest in overturning the *Moten* settlement at this time, since either the Washington Lawyers Committee or the District Court could act if the lawyers for these two plaintiff classes were to compromise the interests of the pure-*Kimber* plaintiffs in such a way as to wrongly (if so) place sole liability on Izzo. This is because we believe the language emphasized above is evidence that the parties to the settlement recognized that a union-wide EEO officer might, under this provision, have conflicting "responsibilities" and "obligations to the members of Local 6 affected." In approving the settlement, District Judge Robinson must have intended his continuing jurisdiction and memorialization of good faith/reasonableness to apply to paragraph 16(b), as well. Situations might be hypothesized in which the EEO officer of Local 6 might attempt to avoid imposition of liability on the defendant unions (such as by not bringing suit at all) and then the watchdog role of the Lawyers Committee, or the supervisory jurisdiction of the District Court, might be triggered to defend the interests of injured union members. The remote contingency of exercise of this power by the EEO officer in a manner injurious to Izzo, if not dissipated by the actions of the Committee or the District Court, might be dealt with by a then-proper motion to intervene steeped in those facts.

To the extent that paragraph 16(b) binds counsel for those *Kimber* plaintiffs who are also *Moten* plaintiffs to hold the unions harmless, it merely formalizes the status quo ante. The settling bricklayers who are plaintiffs in both suits have their remedy against the unions, and could hardly be expected by Izzo to be allies on its motion to implead in *Kimber*.

Izzo has shown no right to intervene and overturn these provisions of paragraph 16(b) at this time. Its primary interest is in impleader in *Kimber*, an interest not "relating to the property or transaction which is the subject matter of this action," nor "as a practical matter impaired or impeded in protection thereof by the disposition below." R. 24, Federal Rules of Civil Procedure.

District Judge Robinson was surprised to learn during the Rule 23 hearing that despite its obvious interest in doing so, Izzo had not, as of that hearing date, made any effort to implead the unions as parties defendant in *Kimber*:

The Court: Did you file suit against the union?

Mr. Levien: I beg your pardon?

The Court: Did you bring the union in?

Mr. Levien: Well, Your Honor, we are waiting to do that.

The Court: Waiting for what?

Mr. Levien: Well, Your Honor.

The Court: I don't understand this business. Waiting for what? Izzo gets sued by a class that says, "You have been discriminating against us." Izzo says "No it's not me. Whatever I do I have to do by virtue of what 1 and 4 have done to me."

Mr. Levien: Well, Your Honor—

The Court: And you don't bring 1 and 4 in?

Mr. Levien: I think you can follow, as Mr. Brown said, the progress of our efforts. We had filed in late April motions to intervene and consolidate. Obviously the next step is to file an impleader motion. But in the interim, we have had the settlement and we have had negotiations again. We are at a point where we may be able to settle the thing. Settlement comes out and we see in the papers a provision whereby plaintiff's counsel will oppose impleader of the unions. Certainly we want to resolve the situation as to the plaintiff's counsel before we file impleader motions, because if counsel is freely independent to pursue the best interests of the class in *Kimber*, we would submit that they would greet an impleader motion.

So, why should we file an impleader motion with plaintiff's counsel who is going to oppose it when we believe that independent counsel, that is, counsel not tied to the settlement here, will join with us?

The Court: But counsel won't determine whether there is an impleader or not.

Mr. Levien: Well, counsel will oppose it.

The Court: Well, the Court will hear counsel but the Court will not fall over dead because counsel says we oppose interpleader [sic].

Mr. Levien: Of course.

The Court: You put that matter to the court and the court says, "Yes, they belong in here. In they go."

Mr. Levien: Of course, Your Honor. But I don't think the Court would for a moment believe that papers submitted by counsel will not have some effect.

The Court: Well, they will be submitted by you also, will they not?

Mr. Levien: Yes, Your Honor.

Tr. at 49–51.

That colloquy did not stress that the *Kimber* plaintiffs for their own reasons, chose not to join the unions in the first instance. We cannot speculate that those individuals who are plaintiffs in both suits (and hence bound by and benefitting from the settlement) would now favor impleader of the defendant unions but for the fact that paragraph 16 has tied their hands. District Judge Robinson believed that adoption of paragraph 16 would in no way prejudice decision of Izzo's motion for impleader in *Kimber*, and we agree:

The Court: Then representations will be made to the other court; every representation you make to me. You say, "Look at the impact of this.[ ] They have to be in here, they have to be in here without regard to the basis upon which they settled the other litigation.["]

Mr. Levien: That's certainly true. But all we are asking this court is not to institutionalize that type of an arrangement. It can be prevented today.

The Court: I cannot institutionalize anything with respect to another piece of litigation. I have no authority to intrude in this and make any order in this case that has any impact.

Tr. at 51.

Finally, paragraph 16(c) provides for reimbursement of the defendant unions by persons bound in the *Moten* settlement who recover from those unions in other EEO litigation:

(c) It is the intention of the parties to this Stipulation of Settlement that the establishment of the back pay fund pursuant to paragraph 19 below shall constitute full and final payment of any monetary claims against the International, Local 1, and Local 4, existing prior to July 1, 1974, which relate to the subject matter of this litigation and which are held by past and present members of Local 4 who do not ask to be excluded from the classes requested to be established to effect this Stipulation of Settlement. Accordingly, if as a result of any existing or future action against any employer for racial discrimination and notwithstanding the provisions of (a) and (b) above, the International, Local 1, Local 4, or Local 6 is held liable (whether by con-

tribution, indemnity, or otherwise) to any employer on account of an award of money damages to any such past or present member of Local 4, such member shall reimburse the International, Local 1, Local 4, or Local 6, as the case may be, for that part of such award to him for which such liability has been incurred.

As we read the terms of this clause, those *Kimber* plaintiffs not already receiving the benefits of the *Moten* settlement are both free to pursue their remedies against the unions and not bound by the reimbursement provisions. The same would be true of any non-union members of the *Kimber* class.

Izzo's concern here is that the unions seek to impose full liability on Izzo alone in the *Kimber* suit. But as our examination of the agreement convinces us that it will not automatically have that effect, we do not agree with Izzo when it suggests that the District Court's approval of the stipulation of settlement, or our affirmance of its judgment, will prejudice Izzo in the *Kimber* litigation by denying it the opportunity to argue for and win impleader of the unions as parties defendant. Without seeking to express a view of the propriety of procedural motions in litigation beyond our jurisdiction, we reiterate that our decision today is without prejudice to any other rights which appellant Izzo may have in other forums. So long as there is no automatic action in the *Kimber* litigation which is based upon a misreading of our action today, we see no prejudice to Izzo.

Were the reimbursement provisions read to bind all members of all defendant unions (including those members who did not join in the settlement or participate in the back pay fund) it might unfairly cut off a remedy against the unions without any consideration. Whether this would give Izzo an intervention interest (because of increased potential liability) is an issue which we need not reach because from the evidence before us we find that the intended reach of paragraph 16(c) is adequately shown in its first sentence. The provision applies only to *Moten* plaintiffs bound by the settlement, and is intended by the unions to protect themselves against double recovery by *Moten* plaintiffs who are also members of the plaintiff class in *Kimber* and any ensuing litigation. So long as any employer found liable for discrimination could proceed against the union for total or partial liability,[25] the employer is not harmed by plaintiffs' agreement to reimburse the union for amounts recovered from it.

## III. CONCLUSION

After study of the stipulation of settlement, and particularly the provisions by which the parties to the settlement pledge to take certain steps in other pending and ensuing equal employment opportunity cases, we are satisfied that Izzo had no direct intervention interest and also that its position is not automatically changed by the agreement in such a way as to thereby obtain an intervention interest.[26]

---

**25.** *See, Rose v. Associated Anesthesiologists*, 163 U.S.App.D.C. 246, 501 F.2d 806 (1974). Understandably, Izzo would prefer to have the plaintiffs in *Kimber* assert the sole or joint liability of the unions, rather than suing Izzo alone. However, the appropriate manner in which to assert the liability (if any) of the unions is limited to compulsory joinder or assertion of a third-party claim against the unions in *Kimber*. While we are sympathetic with Izzo's fears that our action today may be misread to require some result on impleader attempts in *Kimber* (we reiterate that no automatic result is intended), we cannot agree that by staying proceedings in that case pending these instant appeals, Judge Waddy has put the issue of joinder therein squarely before us. There are procedures under 28 U.S.C. § 1292(b)

by which the District Court may certify like questions to this Court, and those procedures have not here been invoked.

**26.** Our decision affirming the District Court's denial of intervention as of right under Rule 24 makes unnecessary the treatment of several other contentions of the motion to dismiss, such as that even if Izzo were granted intervention, it nevertheless may not appeal an agreed-to settlement between the primary parties. The Fifth Circuit has held that partial settlement among some plaintiffs and defendants is final "as to the rights and liabilities of the settling parties (none of whom seek to appeal) because it effectively terminates the controversy among them." And as to the parties among whom live controversies remain, such order is nonappealable because it lacks finality: it does

The judgment appealed from in No. 74–1835 is affirmed; the appeal in No. 74–1837 is dismissed for want of jurisdiction.

*So ordered.*

On Motion to Tax Attorneys Fees Against Appellant in No. 74–1837

Before LEVENTHAL and ROBINSON, Circuit Judges.

PER CURIAM:

Moten, in behalf of a class of black bricklayers, brought an action against the Unions under Title VII of the Civil Rights Act of 1964. The action against the Unions[1] resulted in a settlement. The District Judge approved the settlement preliminarily and scheduled a hearing. Objections to the settlement were presented in the District Court, and appeals were taken to this court, by an employer, Izzo, No. 74–1835, who sought to intervene as a party defendant, and also by an employer's association, Mason Contractors Association, No. 74-1837, which presented objections without formally presenting a motion to intervene.[2] Both Izzo and the Association were represented by the same law firm. Moten, *et al.*, as appellees, filed a motion to dismiss or for summary affirmance as to Izzo, and a motion to dismiss the appeal of the Association for lack of jurisdiction.

On May 6, 1976, we issued an opinion. We easily dismissed the Association's appeal for want of jurisdiction, since it had not sought to be made a party and was therefore treated as no more than an amicus curiae. There was more difficulty in regard to Izzo's appeal, and there we affirmed the settlement order of the District Court, which included a provision denying Izzo's application for intervention.

Moten, *et al.* now present a motion under the Act, 42 U.S.C. § 2000e-5(k), to tax attorneys' fees and other costs against the Association respecting No. 74-1837. The attached bill shows a modest sum, approximately $200.00, as costs, but claims attorneys' fees for services rendered in connection with both appeals at $6,787.50, and for services rendered in connection with the motion to tax attorneys' fees and costs at $2,300.00. Both calculations reflect time of the partner involved at $75 per hour, and time of associates of the law firm at $50 per hour. No award is sought from Izzo, appellant in No. 74-1835, because Izzo has made a lump sum payment in connection with settlement of the *Kimber* suit, which eliminates liability for costs and fees in Moten's action. The plaintiffs seek an award from the Association of 50% of the fees and costs incurred in connection with the appeals.

The first question is whether any attorneys' fees are taxable against the Association under Title VII, since the Association was not a "party." But the Association purported to become a party appellant when it filed its appeal, and the plaintiffs were compelled to defend against its efforts in order to maintain their hard-won settlement agreement. This is not a situation in which the court is being asked to enter an award against a person which has in no way entered its name upon the court records. We think the liberal purposes of 42 U.S.C. § 2000e-5(k) are furthered by, and provide authority for, an award against the Association.[3]

The Association's opposition to the motion to tax costs brings out that the appellees' pleadings show six pages of text devoted to the appeal of the Association as against 49 pages for Izzo's appeal; and that the court's opinion uses only one page for the Association's appeal as against 29 pages

---

not end the litigation by finally determining the rights of those parties. *Goldstein v. Andresen & Co.,* 465 F.2d 972, 973 (5th Cir. 1972). While we do not reach this question, or pass upon the validity or applicability of *Goldstein,* we note that in trying to determine what a partial settlement had concluded between which parties, we would, of necessity, conduct an interest examination not wholly unlike that engaged in here.

1. Bricklayers, Masons and Plasterers International Union of America, and its Local No. 1.

2. Anthony Izzo Company, Inc., and Mason Contractors Association of the District of Columbia.

3. This court has recently addressed itself to the purposes of that provision in *Grubbs v. Butz* (D.C.Cir., July 26, 1976).

for Izzo's appeal. These data are not controlling, but they are a backdrop for our more qualitative appraisal. We have taken note of appellees' claim that it is not feasible to separate out the work done on the two appeals. But we have little doubt that it was the appeal of Izzo which prompted the extensive efforts of appellees' counsel, including the cross-references to the separate *Kimber* litigation against Izzo by a class of employees overlapping Moten's, and considerable discussion of the merits. If it had not been for Izzo's appeal, the appeal by the Association would have been dismissed summarily, on bare motion papers, without reference to the merits, and without oral argument. Appellees are not to be limited to the purely incremental costs occasioned by the Association, but we think any fair allocation and appraisal cannot reach a 50% mark.

This is a matter that the appellate court deems appropriate to determine at the appellate level, *cf. Freeman v. Ryan*, 133 U.S. App.D.C. 1, 408 F.2d 1204 (1968). The crucial facts involved pertain to the handling of the appellate litigation, and that matter is marked by neither a mixture of district court and appellate litigation nor issues requiring an evidentiary hearing.

We exercise our judgment by ordering that the Clerk enter an order taxing against the Association (a) the allowable costs incurred by appellees in No. 74-1837,[4] (b) 15% of the $6,787.50 calculated by appellees' counsel as appropriate fees for attorneys' services rendered on the combined appeals; plus (c) an additional $300 for necessary services in preparing the motion to tax attorneys' fees.

*So ordered.*

---

4. This assumes that allowable costs are readily segregated and identified. If appellees convince the Court that they are inextricably mingled, then costs in No. 74-1837 shall be set at 15% of taxable costs incurred in both appeals. The amount is not significant.